IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JUN 1 7 2009

CLERK, U.S. DISTRICT COURT

TIMOTHY R. MARTIN,

    Plaintiff,

v.                                    Civil Action No. 3:08cv417

SCOTT & STRINGFELLOW, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the Motion for Summary Judgment (Docket No. 97) filed by the plaintiff, Timothy Martin,[1] and the Motion for Summary Judgment (Docket Number 126) of the Defendant, Scott & Stringfellow, Inc. (S&S).   For the reasons set forth below, Martin's motion for summary judgment will be denied, and the motion for summary judgment of S&S will be granted.

## BACKGROUND

The following facts are undisputed by the parties unless otherwise noted.   On September 7, 2004, S&S hired Martin, who was fifty-one-years-old at the time, to "head up" a Distressed Commercial Mortgage Backed Securities Group ("CMBS") at its

---

[1] Martin proceeding pro se in this action.   Therefore, the Court will liberally interpret all of his filings and evidentiary proffers where possible.   See Estelle v. Gamble 429 U.S. 97, 106 (1976) (pro se documents are to be liberally construed); Noble v. Barnett, 24 F.3d 582, 587 n.6 (4th Cir. 1994) (holding same).

Charlotte, North Carolina office.   (Pl. Dep. at 48)   Martin was interviewed by Ted Luse, head of the S&S Fixed Income Department, and William B. Cameron, head of the CMBS group at the Charlotte office.[2] (Id. at 42-44.)   Cameron made the decision to hire Martin based on his familiarity with Martin and his high regard for Martin's abilities in the sale of CMBSs. (Def. Mem. at Ex. 5, ¶¶ 5-6.)   Cameron was aware that Martin was 51 years old at the time that he was hired. (Def. Mem. at Ex. 5at ¶ 7.)

Martin, by his own admission, was hired as a salesman for distressed CMBS products.[3] (See Def. Mem. at Exs. 5, 7, 8.) Therefore, Martin was permitted to undertake only "riskless" sales of CMBS products, i.e., sales in which no capital of S&S was at risk. (Def. Mem. at Ex. 5, ¶ 8; Def. Rep. at Ex. G, pp. 86-87.)   Martin was paid a commission of 40% (in some cases, 45%) on each sale of a CMBS.   (Def. Mem. at Ex. 2.)   Martin

---

[2] Martin, at a few points, appears to argue that Cameron and Luse could not have been his supervisors because they had not passed the required Financial Industry Regulatory Authority ("FINRA") examinations.   (Pl. Mem. at ¶¶ 10, 11, 14.)   It is the uncontradicted testimony of several witnesses and pieces of evidence that, whether or not S&S was complying with FINRA rules, Cameron actually supervised Martin, until early March, 2006, when Daniel Cardani became Martin's supervisor.   Luse was the superior of Cameron and Cardani, respectively.   Therefore, his assertions on this point will not be further considered.

[3] In his Memorandum in Support of his Motion for Summary Judgment, Martin claims that he was hired as a "trader," rather than as a salesman. (Pl. Mem. at ¶¶ 10, 28.)   This claim is unsupported by the evidence and contradicts both earlier statements by Martin himself and the rest of the record.

generated approximately $610,000 in sales of CMBS products in the first four months of 2005, thus generating personal commissions of approximately $274,000. (Def. Mem. at Ex. 9; Def. Rep. at Ex. G, pp. 89-90.)  Based on these sales, Martin was awarded a "Sterling Performer Award" for the first quarter of 2005 in June, 2005. (Def. Mem. at Ex. 10.)

In early 2005, S&S decided to allow Martin to put its capital at risk in sales of CMBS products. (Id. at Ex. 3, p. 27; Ex. 5, ¶ 9, 11.)  As a consequence, Cameron and Luse decided that Martin's compensation structure needed to be revised in order to account for the financial risk to S&S. (Id. at Ex. 5, ¶ 11.)  This arrangement created a "reserve fund" from the profits of the risk transactions, intended to protect the financial integrity of S&S, and thereby made Martin responsible for losses suffered by S&S on Martin's "risk" transactions. (Id. at ¶ 11.) Martin eventually contributed to this reserve fund, but Martin denies that he ever explicitly agreed to this compensation arrangement. (Id. at Ex. 7; Pl. Resp. at 19.)  In any event, Martin was not happy with this payment structure and complained to Cameron, Luse, and other employees about it throughout 2005. (Def. Mem. at Ex. 3, pp. 100-101; Ex. 12, ¶ 6.)

Martin, evidently, was also unhappy with Cameron's management technique. (Def. Mem. at Ex. 13, pp. 37-38.)  In May, 2005, Martin sent an email to Luse, Cameron's manager,

3

complaining of his rocky relationship with Cameron. (Pl. Dep. at 148; Def. Mem. at Ex. 14.)   Martin also sent an email to Daniel Cardani, the National Sales Manager, alleging that Cameron had lied to Martin and stating that Martin had no respect for Cameron and wished to cease working for him. (Pl. Dep. at 442; Def. Mem. at Ex. 15.)   Throughout middle and late 2005, Martin's stream of disparaging comments about Cameron continued. (See Def. Mem. at Exs. 16, 19.)   Martin communicated his distate for Cameron to a number of S&S employees, including Luse; referring to Cameron as the "emperor. . .  [with] no clothes" and a "real bad hire." (Id. at Ex. 16.)   Martin simultaneously expressed his dissatisfaction with Cardani. (See id.)   This unhappiness led Martin to the pursuit of other employment opportunities with competing brokerage firms. (Def. Mem. at Ex. 3, p. 102.)

Martin also began to question Cameron's relationship with Martin's assistant, Kate Mosser. (Def. Mem. at Ex. 16.)   Martin alleged that Cameron's objectivity has been compromised by the relationship and that he was taking an inappropriate interest in Mosser. (See id. at Exs. 16, 17.)   Martin also stated that rumors were circulating among S&S employees that Cameron and Mosser were having an affair. (Id. at 17.)   Additionally,

4

Martin, in an email to a coworker, referred to Mosser as Cameron's "little bitch.[4]" (Id. at Ex. 18.)

Cameron became aware of Martin's comments in October, 2005, while on a business trip to New York. (Def. Mem. at Ex. 5, ¶ 12.)  Cameron says that Mosser accompanied him on the trip to further her training and experience. (Id.)  John Sherwood, an S&S employee, informed Cameron that Martin was commenting to other employees about the alleged affair between Cameron and Mosser. (Id.)  Upon his return to the office, Cameron informed Martin that such statements were unacceptable. (Id.; see also Def. Mem. at Ex. 3, p. 51.)  In November 2005, Martin drafted a "Business Plan" in which he stated that Cameron and Mosser had an inappropriate relationship and that Cameron had lost his objectivity toward Mosser. (Def. Mem. at Ex. 20.)

It was also in November, 2005 that Martin "mooned" the trading floor at the Charlotte office. (Def. Mem. at Ex. 13, pp. 74-76.)  While Martin now simultaneously denies this event entirely and offers an alternative explanation for it, his deposition testimony taken during the arbitration proceeding makes clear that he intentionally mooned the trading floor at

---

[4] Martin now attempts to claim that his use of this phrase was simply a repetition of how Cameron had referred to Mosser. (Pl. Opp. at 17-18.)  This allegation is not supported by the record: there is no evidence that Cameron ever used such a phrase in relation to Mosser and, more importantly, Martin previously has stated that the phrase in question was his own. (See Def. Mem. at Ex. 13, p. 29.)

least once, after having been "egg[ed] on," and that he regretted the event and regarded it as sophomoric. (Id.)

In late November 2005, Martin suffered a loss of $545,000 on a risk transaction involving bonds the value of which had been significantly reduced by the impact of hurricane Katrina (the "Katrina bonds"). (Pl. Dep. at 239.) Shortly thereafter, Martin sold a number of Goldman Sachs bonds at a profit. (Def. Mem. at Ex. 5, ¶ 13.) Cameron, in accord with his earlier conversations with Luse about Martin's compensation structure on risk transactions, offset Martin's commission on the Goldman Sachs transaction to reflect the loss on the Katrina bonds. (Id.; see also Def. Mem. at Ex. 12, ¶ 8.)

Martin was informed of this decision in December 2005 and strongly disagreed with it. (Pl. Dep. at 247-49, 255-56.[5]) Evidently, Cameron's decision to withhold the commission on the Goldman Sachs bonds would compromise Martin's ability to complete his planned purchase of a house. (Id. at 255.) Martin immediately drafted a memorandum expressing his disagreement and sent it to Luse on December 24, 2005. (Def. Mem. at Ex. 21.)

---

[5] Martin alleges that, during this conversation, he made reference to Cameron's statements concerning trading being a young man's game. (Pl. Opp. at 4.) There is no evidence in the record to support this assertion, and Martin made no mention of these alleged statements during his deposition testimony about the December 23, 2005 meeting. (See Pl. Dep. at 246-49.) Therefore, Martin's allegation on this point does not create a genuine issue of material fact. See Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 438 (4th Cir. 1999).

In that memorandum, Martin related a comment allegedly made by
Cameron that trading was a "young people's game and that I
[Martin] was too old to want to be a trader." (Id.) Martin
again mentioned his opinion that Cameron's treatment of him
could be considered age discrimination. (Id.) Luse was not
persuaded by Martin's memorandum and states that he did not
inform Cameron of Martin's allegations of age discrimination.
(Def. Mem. at Ex. 12, ¶ 9.)

Martin was distressed by Luce's refusal to reconsider his
compensation decision and, on January 4 and 5, 2006, sent emails
to Cardani stating his negative feelings for Cameron. (See id.
at Ex. 23.) Martin also made references to Cameron's alleged
relationship with Mosser. (See id.) Indeed, Martin went so far
as to suggest that both Cameron and Mosser should be terminated.
(See id.) Later, on January 5, Martin sent Cardani a lengthy
memorandum entitled "Connecting the Data Points," which
primarily contained allegations of the alleged Cameron-Mosser
affair and the effects of that putative affair on Cameron's
performance as a manager. (See Def. Mem. at Ex. 24.) Martin
previously has stated that his intention in communicating the
Data Points memorandum was to convey to Cardani that Cameron had
withheld Martin's commission because of Cameron's affair with
Mosser. (Def. Mem. at Ex. 13, p. 34.)

Cameron was informed of the January 4 and 5 emails and, after conversing with Luse, decided that disciplinary action against Martin was appropriate.[6] (Def. Mem. at Ex. 5, ¶ 14.) To that end, Cameron presented Martin with a written Performance Improvement Plan ("PIP"). (See id. at Ex. 25.) The PIP confirmed in writing the compensation arrangement between S&S and Martin for risk transactions and certain behavioral expectations. (See id.) The PIP also resulted in Martin being placed on "probationary" status. (See id. at Ex. 5 ¶ 15; Pl. Opp. at Ex. 24.)

Martin was upset by being placed on the PIP, and contacted the Human Resources ("HR") department. (Pl. Dep. at 258-61.) In addition to talking with Sherry Harper of HR, Martin composed a memorandum, in which he repeated the allegations about Cameron and Mosser's affair and about Cameron's alleged discriminatory statement. (Def. Mem. at Ex. 26, pp. 1, 2.) Martin also sent a similar memorandum to Diann Fox, another HR employee, on January 17, 2006, where he was more explicit in his claims of age discrimination. (Def. Mem. at Ex. 3, pp. 80-81; Def. Mem. at Ex. 8; Def. Rep. at Ex. A, ¶ 4.) It is the uncontradicted testimony of both Cameron and Luse that they were unaware of these two memoranda until the start of litigation. (Id. at Ex. 5, ¶ 18;

---

[6] Although Martin argues otherwise, the record contains no evidence that Cameron was made aware of the Connecting the Data Points memorandum.

Ex. 12, ¶ 11.) Furthermore, Fox testified that the January 13 and 17 memoranda were never shown to Cameron and she had not informed Cameron of any discrimination claims made by Martin. (Def. Rep. at Ex. A, ¶ 5.)

After these events, S&S allowed Martin essentially to work from home; Martin returned to the Charlotte office only a few times, and had cleaned out his desk by early February, 2006. (Def. Mem. at Ex. 13, pp. 65-66.) On January 18, 2006, during the period that Martin was working from home, Cameron received a report from Harold Philips, another S&S employee, that Martin had made disparaging remarks about S&S to a client of the firm. (Id. at Ex. 5, ¶ 19.) Philips told Cameron that the client had revealed to him that Martin had told the client that S&S was in bad financial straits. (Id.) Martin denies that these comments were made, but does not dispute that Phillips made the allegations to Cameron. (Pl. Opp. at 23.)

This hearsay statement was sufficient to prompt Cameron to become concerned about Martin's loyalty, and he removed Martin's access to various technological services used in his position, including RealPoint, an electronic research service. (Id.) Martin complained to Cameron and the HR department, and his technological access was restored, with the exception of RealPoint. (Id. at Ex. 13, pp. 79-82.) For administrative reasons, rather than restore Martin's access to RealPoint,

Martin was provided with Mosser's password, and allowed to use her account. (Id. at Ex. 28, ¶ 4; Ex. 5, ¶ 20.)   Martin also alleges that his access to the Trading Blotter was never restored. (Pl. Opp. at 23.)

On February 17, 2006, the PIP under which Martin worked was revised. (See Def. Mem. at Ex. 13, pp. 67-68; Ex. 29.)   Luse, Cardani, and Cameron stated that they had been incorrect to place Martin on probation and revoked his probationary status. (Def. Mem. at Ex. 29.)   Martin's position with the firm was clarified: while he would remain a salesman who could engage in riskless transactions, his refusal to be responsible for losses meant that S&S prohibited him from engaging in risk transactions. (Id.) S&S agreed, however, that this position could be reconsidered, if Martin submitted a written business plan for the risk transaction proposed. (Id.)   Martin never submitted such a plan. (Def. Mem. at Ex. 13, pp. 69-70.) Furthermore, as part of the revised PIP, Martin was paid the commission on the Goldman Sachs bonds, but a $500,000 minimum yearly sales expectation was established for Martin's practice. (Id. at Ex. 29.)   Martin easily exceeded this target number in 2005, but was concerned by the new rules. (Def. Mem. at Ex. 13, pp. 70-72.)   Cameron has testified that he was unaware of Martin's complaints of age discrimination when he was designing

the revised PIP. (Def. Mem. at Ex. 5, ¶ 21.)   There is no evidence in the record that he was aware of those complaints.

Martin repeatedly alleges that, just before Cameron's implemented the revised PIP, Cameron had engaged in a conspiracy with Luse to create an excuse to terminate Martin. (See, e.g., Pl. Mem. at ¶ 4; Pl. Opp. at 24.)   This allegation is based on an audiotape (the "Dawson" audiotape) of a conversation between Cameron and John Sherwood, another S&S employee, created by Sherwood without Cameron's knowledge. (See id.[7])   As an initial matter, nothing in the audiotape refutes Cameron's testimony that he was unaware of Martin's allegations of age discrimination.   Secondly, a remark made during the conversation concerning Martin's proposed move to the Richmond office of S&S reveals that the earliest date upon which this conversation could have taken place was February 28, 2006 - the date on which Martin first suggested a transfer to the Richmond office. (Def. Opp. at Ex. C, p. 16; Pl. Dep. at 335-39.)

---

[7]   Martin also proffers another audiotape, referred to as "BC_hedging," that he alleges provides proof of Cameron's attempt to tamper with witnesses in this action. (Pl. Mem. at ¶¶ 5, 6.)   Apart from being irrelevant to this matter, the content of the audiotape does not support Martin's allegation. (See Def. Opp. at Ex. B, pp. 49-51.)   The conversation memorialized on the audiotape only supports an argument that Cameron anticipated litigation, and, therefore, moderated his own comments to others. (See id.)   Furthermore, the "BC_hedging" tape contains no indication that Cameron knew of Martin's complaints of discrimination or possessed any discriminatory motive. (See Def. Rep. at Ex. B.)

Notwithstanding the revocation of Martin's probationary status, Martin still expressed a desire to separate from S&S. (Def. Mem. at Ex. 13, pp. 76-77.) On February 24, 2006, Martin's attorney informed S&S that he wished to fashion a separation agreement. (Def. Mem. at Ex. 30.) S&S, not wanting to part ways with Martin, offered him two options: he could remain in the Charlotte office with a different supervisor or he could transfer to Richmond and report to Cardani directly. (Def. Mem. at Ex. 13, pp. 77-78; Ex. 31.). Martin decided on the second option and a meeting with Cardani was scheduled for March 13, 2006. (Id. at Ex. 3, p. 63; Ex. 32.) Cameron's supervision of Martin ended at that point, and Cardani assumed the role of Martin's supervisor.[8] (Id. at Ex. 5, ¶ 22; Ex. 12, ¶ 13; Ex. 33, ¶ 5.)

Martin, without Cardani's knowledge, taped their March 13, 2006 meeting. (Def. Mem. at Ex. 33, ¶ 7.) During this conversation, Cardani informed Martin that he would have full access to necessary technologies, would likely be able to build a successful practice in Richmond, and arranged for Martin to have a position near Al Gribben, a friend of Martin's who worked

---

[8] Martin now alleges that he never accepted the position in Richmond; that Cardani offered only a trial period, rather than a permanent position; and, that Cameron continued to supervise him until he resigned. (Pl. Opp. at 25-26.) These allegations have no support in the record and, as demonstrated above, are directly contradicted by previous statements of Martin himself. Therefore, those allegations need not be further considered.

12

in Richmond. (See id. at Ex. A, pp. 20-32.) Cardani's "pleasant" attitude toward Martin continued throughout Martin's tenure in the Richmond office. (Pl. Dep. at 361.)

The following day, March 14, 2006, Martin reported for work in the Richmond office and attempted to access RealPoint. (Def. Mem. at Ex. 13, p. 86.) Martin called RealPoint to arrange for access, but was denied, because S&S was entitled to only one authorized RealPoint user who, after the events of January 18, 2006, was Mosser. (Def. Mem. at Ex. 5, ¶ 23.) For a second authorized user to have been added, S&S would need to pay for a higher level of access. (Def. Mem. at Ex. 13, pp. 87-88.) RealPoint contacted Cameron for authorization to add Martin as a user; Cameron, however, lacked the authority to expend S&S funds for this purpose. (Def. Mem. at Ex. 5, ¶ 23.) Furthermore, Cameron already had instructed Mosser to give her RealPoint password to Martin. (Id.)

Martin complained to Cardani about the RealPoint situation on Thursday, March 16, 2006. (Def. Mem. at Ex. 13, p. 89.) Cardani, however, was unfamiliar with the technology and the situation, and advised Martin that he would speak to Luse when Luse returned from vacation the following Monday. (Id.; Def. Mem. at Ex. 33, ¶ 8.)

Martin never spoke to Luse about the RealPoint issue, however, because during the afternoon of March 16, 2006, Martin

13

was informed by his child's psychologist that he was needed at home in Jacksonville, Florida. (Pl. Dep. at 393-77, 402-04.) Martin informed Cardani that he was returning to Jacksonville and flew home that day. (Id.) Martin originally intended to return to Richmond on Monday but, on Sunday night, decided to resign. (Id. at 406.)

After properly exhausting his administrative remedies, Martin filed this action, alleging that S&S, through its employment practices, violated the Age Discrimination Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. Martin specifically alleges that he was subjected to a hostile work environment due to his age, constructively discharged due to his age, and subjected to discriminatory terms and conditions of employment in retaliation for having engaged in protected activity, all in violation of the ADEA.[9] (Pl. Mem. at ¶ 1.)

On February 19, 2009, Martin filed a motion requesting summary judgment (Docket No. 97).[10] While Martin briefly

---

[9] Martin mistakenly relies on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, as the basis of his retaliation claim. (Pl. Mem. at ¶ 2.) However, because Martin is alleging age discrimination, the Court will consider his retaliation claim under the ADEA.

[10] Martin also has recently moved for leave to add exhibits and supplement his declaration under Fed. R. Civ. P. 56(f). The exhibits that Martin seeks to add are already in evidence and will be considered by the Court, and the additions to his declaration only concern the authentication of those exhibits. (See Pl. 56(f) Mem. at 1-2.) Therefore, Martin's Motion for

14

mentions a hostile work environment, constructive discharge, and discrimination, Martin's motion seems to only request summary judgment in favor of his retaliation claim and summary judgment against the application of S&S's after-acquired evidence defense. (Pl. Mem. at ¶¶ 1, 58, 64, 72-73). However, courts are instructed to take "special care with pro se litigants." See, e.g., Moore v. City of Harriman, 272 F.3d 769, 799 (6th Cir. 2001). It is, therefore, prudent for the Court to analyze Martin's request for summary judgment as a request for summary judgment on all claims instead of partial summary judgment on only the retaliation claim. See Haines v. Kerner, 404 U.S. 519, 520 (1972) (stating that courts have a duty to "interpret charitably" pleadings filed by pro se litigants). S&S has responded to Martin's motion and also filed its own motion for summary judgment on all issues, to which Martin has responded.

DISCUSSION

## I. Standard Of Review

Summary judgment is appropriate where there is no genuine issue as to any material fact in the case. See Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a

---

Permission to Add Exhibits (Docket Number 141) will be denied as moot.

genuine dispute exists.    See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   A material
fact in dispute appears when its existence or non-existence
could lead a jury to different outcomes. See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).   A genuine issue of
material fact exists when there is sufficient evidence on which
a reasonable jury could return a verdict in favor of the non-
moving party.   See id.

     Hence, summary judgment is only appropriate when, after
discovery, the non-moving party has failed to make a "showing
sufficient to establish the existence of an element essential to
that party's case, and on which that party will bear the burden
of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986).    When a motion for summary judgment is made, the
evidence presented must always be taken in the light most
favorable to the non-moving party.    See Smith v. Virginia
Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996).

     Nevertheless, a party cannot "create a genuine issue of
material fact through mere speculation or the building of one
inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th
Cir. 1985).   Accordingly, the party who bears the burden of
proof at trial cannot survive summary judgment without
sufficient evidence to sustain his or her burden of proof on
that point.  Celotex Corp., 477 U.S. at 327.

16

## II. Age Discrimination: Constructive Discharge

The ADEA's core provision, codified at 29 U.S.C. § 623, prohibits employers and certain others from discrimination based on an individual's age whenever the individual is at least 40 years of age but less than 65 years of age. To succeed on an ADEA claim, the plaintiff must demonstrate, by a preponderance of the evidence, that "the plaintiff's age ... actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141, (2000) (internal quotation marks and alteration omitted). To prove a claim of constructive discharge by virtue of a hostile work environment, the plaintiff must prove two elements: that his working conditions were objectively intolerable and that his employer's actions were intentional and motivated by ageism. See Honor v. Booz-Allen & Hamilton, 383 F.3d 180, 186-87 (4th Cir. 2004).

A plaintiff may overcome a motion for summary judgment against his ADEA claim by relying on either of two methods of proof. The first method of proving a violation of the ADEA is to provide direct or circumstantial evidence that the prohibited characteristic (i.e., age) was a motivating factor in the adverse employment action, in this case, the putative constructive discharge. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004). The second method is known as the

17

"McDonnell Douglas burden-shifting framework" and requires that the plaintiff demonstrate a prima facie case of discrimination, then shifts the burden to the employer to demonstrate the employer to demonstrate a legitimate reason for the adverse employment action, then the burden shifts back to the plaintiff to demonstrate the falsity of the proffered reason. See Laber v. Harvey, 438 F.3d 404, 431-32 (4th Cir. 2006). Martin does not make clear under which theory he is proceeding, so analysis of both is necessary.

**A. Direct or Circumstantial Evidence**

**1. Intent**

As noted above, a plaintiff's claim of age discrimination can survive if he provides direct or circumstantial evidence that the prohibited characteristic was a motivating factor in the adverse employment decision. See Hill, 354 F.3d at 284. In the constructive discharge context, this requirement means that the plaintiff must prove that the employer's actions were "deliberate[]" and "motivated by" age bias. See Honor, 383 F.3d at 186-87. Deliberateness exists when the actions of the employer were "intended by the employer as an effort to force the employee to quit." Burns v. AAF-McQuay, Inc., 96 F.3d 728 (4th Cir. 1996). This intent to force the employee to quit must be motivated by age bias. See Honor, 383 F.3d at 186-87.

The first method available to Martin to demonstrate this deliberateness and motivation is direct evidence. Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." March v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006) (quoting Taylor v. Virginia Union Univ., 193 F.3d 219, 232 (4th Cir. 1999)). Even if an apparently discriminatory statement exists, it does not create direct evidence of discrimination unless it has a nexus with the employment decision. See id.

Martin has offered no direct evidence that age-based animus was the cause of any putatively intolerable employment conditions. Cameron's alleged statement to the effect that trading was a "young people's game and that I [Martin] was too old to want to be a trader" comes closest to constituting direct evidence.[11] (Def. Mem. at Ex. 21.) This statement allegedly was made in August 2005 after Martin expressed his dislike of a young interviewee, and the statement is not directly indicative of Cameron's intent to discriminate against Martin and has not been

---

[11] Martin also alleges that some unidentified individual, at some point, poked fun at him about his need for bifocals and the implication about his age. (Pl. Dep. at 276-77, 419-20.) This statement is entirely disconnected from any employment action and there is no evidence that it was made by anyone with authority over Martin's working conditions. Therefore, it is irrelevant to the deliberateness portion of the constructive discharge analysis. See Honor, 383 F.3d at 187.

19

shown to be at all related to any employment actions respecting Martin. (See Pl.'s Dep. at 290-92.)

Even assuming that Martin's hearsay testimony is enough to create a genuine issue of material fact as to whether the allegedly offensive statement occurred, it does not have the requisite nexus to any change in employment conditions instituted by Cameron to qualify as direct evidence of discrimination. See Warch, 435 F.3d at 520. Martin first report that Cameron made the statement was made in connection with Cameron's November, 2005 decision to withhold Martin's commission on the Goldman Sachs bonds. (See Def. Mem. at Ex. 5, ¶ 13.) The record discloses no evidence, however, connecting this statement to that decision, which merely reflected standard S&S compensation arrangements with traders. (Id.; see also Def. Mem. at Ex. 12, ¶ 8.) The other adverse employment actions alleged by Martin are even further divorced in time and circumstance from Cameron's comment. Therefore, that comment cannot serve as direct evidence of discrimination, because it has no nexus with any adverse employment action.

The Fourth Circuit came to a similar conclusion in Warch, which was an actual, rather than constructive, discharge case. In Warch, the Court of Appeals found that an employer's disparaging comments about older individuals possessed an insufficient nexus to the adverse employment decision when the statements were

20

unrelated to the adverse employment decision at issue. See id.; see also Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511-12 (4th Cir. 1994) (employer's comment that "there comes a time when we have to make way for younger people" lacked sufficient nexus to termination of employee when made two years prior to that termination and was not explicitly connected to it).

Martin also is permitted attempt to establish discriminatory intent through circumstantial evidence. See Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir. 1984). When evaluating whether the plaintiff has proffered sufficient circumstantial evidence to sustain his claims in the face of a summary judgment motion, the court must determine whether, as a whole, the plaintiff has "presented probative circumstantial evidence to show that [the employer] acted with discriminatory animus." Warch, 435 F.3d at 521.

Martin has provided no probative evidence that age was a causal factor in any employment decision made by S&S. There is no evidence in the record that Martin's age was even considered by any S&S employee in connection with any employment action taken with respect to Martin. Furthermore, Martin has not put forth any evidence that any decision made by S&S was made with the intent to force him to resign because of his age. See Honor, 383 F.3d at 188. Martin's claim is further weakened by the inference that age discrimination was unlikely to have been a

21

motivating factor when the same individual who hired Martin took the adverse employment actions against him a short time later. See Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991). Therefore, Martin has not put forth sufficient direct or circumstantial evidence succeed on his constructive discharge claim. See id. at 186-87; Warch, 435 F.3d at 520-21.

### 2. Working Conditions

Martin similarly has not provided any direct or circumstantial evidence that his working conditions were objectively intolerable. Mere "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not" sufficient to support a claim of objectively intolerable working conditions. Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004). Instead, the plaintiff must demonstrate that the working conditions were so objectively intolerable that a reasonable person would have been compelled to resign. See Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004).

Martin has raised the following conditions of employment in support of his contention that his work environment was objectively intolerable: the temporary withholding of the Goldman Sachs commission; being placed on probation; the institution of the $500,000 minimum annual production expectation; the temporary removal of Martin's access to technology; the problems with

22

Martin's later access to RealPoint; and the removal of Martin's access to S&S capital for risk transactions. (Pl. Mem. at ¶ 68.) Three of these conditions - the Goldman Sachs commission, being placed on probation, and the temporary denial of technological access - had been resolved, largely in Martin's favor, long before his resignation. (See Def. Mem. at Ex. 13, pp. 79-82 (Martin's access to technology restored on January 18, 2006); Id. at pp. 67-68; Ex. 29 (Goldman Sachs commission paid and probationary status removed on February 17, 2006).) Therefore, those conditions will not be considered in analyzing Martin's working conditions for purposes of his constructive discharge claim. See Nye v. Roberts, 145 Fed.Appx. 1, 4 n.1 (4th Cir. 2005) (retaliation occurring three months prior to resignation did not support constructive discharge claim).

The remaining issues (the production expectation, the problems with access to RealPoint, and the removal of access to capital) simply do not rise, individually or collectively, to the level of objective intolerability. The evidence demonstrates that the production expectation was not onerous; indeed, Martin had easily superseded it the previous year. (Def. Mem. at Ex. 13, pp. 70-72.) Furthermore, this expectation was not, and was not linked to, a direct threat of termination or reduction of benefits, which the Fourth Circuit has noted are not sufficient to give rise to a constructive discharge claim. See Alba v.

Merrill Lynch & Co., 198 Fed.Appx. 288, 294 (4th Cir. 2006) (unpublished).  The other two issues – problems with access to RealPoint and removal of access to capital, at most merely inhibited Martin in the practice of his position.  The Fourth Circuit clearly has stated that "mere frustration with . . . inability to accomplish . . .  professional goals does not constitute an intolerable work condition for the purposes of establishing a constructive discharge." Honor, 383 F.3d at 187.

Finally, to the extent that Martin's ongoing tension with Cameron, Luse, and Mosser might be thought to introduce another condition compelling Martin's resignation, the Fourth Circuit has foreclosed that line of argument. See id. (holding that interoffice tensions were insufficient to support a constructive discharge claim); Williams, 370 F.3d at 434 (a supervisor's poor evaluation and negative comments about an employee are insufficient to support a constructive discharge claim). Therefore, Martin's claim of constructive discharge has failed on both elements: deliberateness and intolerability of working conditions. See Honor, 383 F.3d at 186-87.

## B. McDonnell Douglas Analysis

As noted above, if a plaintiff does not proffer sufficient direct or circumstantial evidence of constructive discharge, he may still press his claims under the McDonnell Douglas burden-shifting framework. See Laber, 438 F.3d at 431-32.  In the

constructive discharge context, the _prima_ _facie_ case largely overlaps the pure constructive discharge analysis; the plaintiff must prove the following four elements:

> (1) he was constructively discharged; (2) he was at least 40 years old at that time; (3) he was performing his job duties at a level that met [his employer's] legitimate expectations at the time of his constructive discharge; and (4) he was treated more harshly than other similarly situated younger employees.

_Alba_, 198 Fed.Appx. at 294. The parties do not dispute that Martin was over 40 years old at the time of his resignation, and therefore he has established the second element of the _prima_ _facie_ case. For the reasons discussed in the previous section, Martin has failed to establish that he was constructively discharged. Therefore, his _prima_ _facie_ case has failed at the outset. _See_ _id._ However, in the interest of thoroughness, the Court will complete an evaluation of the _McDonnell_ _Douglas_ framework as it pertains to Martin's constructive discharge claim.

The third element in the _prima_ _facie_ case of constructive discharge is that the plaintiff was meeting his employer's legitimate expectation _at the time of his constructive discharge_. _Id._ The Fourth Circuit consistently and unequivocally has held that the plaintiff's "own testimony, of course, cannot establish a genuine issue as to whether [the plaintiff] was meeting [the employer's] expectations." _King v. Rumsfeld_, 328 F.3d 145, 149

25

(4th Cir. 2003) (collecting cases). This, of course, is because it is the employer's perception that matters, not the employee's self-assessment. See id. To establish this facet of a prima facie case, therefore, the plaintiff must provide some evidence demonstrating the employer's opinion, such as documents from the employer or expert opinion that her performance was satisfactory. See id. at 149-50.

It is certainly true that Martin was meeting the legitimate production expectations of S&S in the first half of 2005, as evidenced by S&S awarding him the Sterling Performer Award. (Def. Mem. at Ex. 10.) Indeed, it appears that, from a purely financial perspective, Martin had an excellent practice throughout his employment, with the singular exception of the significant loss on the Katrina bonds. (See Def. Mem. at Ex. 5, ¶ 13; Def. Mem. at Ex. 33, ¶ 3.)

It is equally clear from the record, however, that Martin was a difficult employee with substantial disciplinary problems: he frequently wrote disparaging emails about his superiors (Def. Mem. at Exs. 16, 19); he spread office gossip and innuendo concerning the alleged Cameron/Mosser affair (Id. at Exs. 16, 17); and, he used utterly inappropriate and insulting language in referring to Mosser (Id. at Ex. 18).

Nonetheless, shortly before he resigned, S&S had reassigned Martin to Richmond as part of an effort to keep him working for

the firm. (Def. Mem. at Ex. 13, pp. 77-78; Ex. 31.) Therefore, this factor must be resolved in Martin's favor at this stage of the proceeding, because the desire of S&S to retain Martin's services is circumstantial evidence that Martin was meeting S&S's expectations.

The final element of the constructive discharge prima facie case is whether the plaintiff was treated more harshly than other similarly situated younger employees. See Alba, 198 Fed.Appx. at 294. Martin has not provided any evidence relevant to this point. Martin does allege that Mosser was treated more favorably by Cameron than he was in general, but he has provided no evidence indicating that she was similarly situated. To the contrary, Martin at times took pains to differentiate the two of them in terms of qualifications and work responsibilities. (See Def. Mem. at Ex. 24.) Furthermore, Martin has not identified any other employee of S&S who was similarly situated. Therefore, Martin's prima facie case fails on this element. The Court need not consider the remaining two steps in the McDonnell Douglas analysis, because Martin has not successfully established a prima facie case of constructive discharge. See Alba, 198 Fed.Appx. at 294.

## III. Hostile Work Environment

Martin also claims that he was subject to a hostile work environment in violation of the ADEA. (Pl. Mem. at 2.) Although

most hostile work environment claims are pursued under Title VII, the Fourth Circuit has stated that a hostile work environment claim is available to individuals over the age of 40 under the ADEA. See Baqir v. Principi, 434 F.3d 733, 746 n.14 (4th Cir. 2006); see also Graham v. Prince George's County, 191 Fed.Appx. 202, 204 (4th Cir. 2006) (evaluating the merits of a plaintiff's hostile work environment claim under the ADEA). For a claim of hostile work environment under the ADEA to survive a motion for summary judgment, a plaintiff must establish that:

> (1) he experienced unwelcome harassment; (2) the harassment was based on his . . . age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.

Baqir, 434 F.3d at 745-46; see also O'Malley, Grenig, & Lee, 3C Federal Jury Practice and Instructions, § 173.22 (5th ed. 2000) (listing the elements of a hostile work environment claim). The facts in the record do not support Martin's hostile work environment claim.

Martin alleges only two incidents that might qualify as unwelcome harassment: Cameron's August 2005 statement about trading being a "young people's game" (Def. Mem. at Ex. 21) and the single incident of mocking by unidentified individuals about Martin's bifocals and age (Pl. Dep. at 276-77, 419-20). Assuming, arguendo, that Martin's recollection of these

28

statements is sufficient to create a genuine issue of material fact as to their occurrence, these statements do not satisfy the second element of the hostile work environment claim, because the statements were not shown to have been of a harassing nature. Instead, the context establishes that the first statement was not directed at Martin and the second was made in jest. If, however, it is assumed that the statements were harassing in nature, they would be "because of" Martin's age and the second element might be satisfied. See Smith v. First Union National Bank, 202 F.3d 234, 242 (4th Cir. 2000).

Even assuming, without deciding, that Martin has raised a genuine issue of material fact respecting the first two elements, his hostile work environment claim clearly fails on the third element: severity and pervasiveness. See Baqir, 434 F.3d at 745-46. This analysis requires both a subjective and objective assessment of the conduct: "[t]he environment must be perceived by the victim as hostile or abusive, and that perception must be reasonable." Ziskie v. Mineta, 547 F.3d 220, 227 (4th Cir. 2008). In assessing whether the allegedly harassing conduct was objectively severe, the court should examine all the circumstances surrounding the alleged hostile environment from the perspective of a reasonable person, including the frequency and severity of the conduct, "whether [the conduct] is physically threatening or humiliating[,] ... and whether it unreasonably

29

interferes with an employee's work performance." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993). At this stage of the proceedings, it must be assumed that Martin holds the subjective belief that conduct in question was severe, because he complained about it. (<u>See</u> Def. Mem. at Exs. 3, 8, 26; Def. Rep. at Ex. A.) Therefore, the salient question is whether the identified harassing conduct is sufficiently objectively severe so as to generate a hostile work environment claim.

Employment discrimination laws are not designed to create a general civility code for the workplace; instead, they only prohibit harassment so severe that it effectively changes the terms and conditions of employment. <u>See</u> <u>E.E.O.C. v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315-16 (4th Cir. 2008). As noted above, the objective analysis of a hostile work environment claim is conducted by examining the totality of the circumstances, with no single factor being dispositive. <u>See</u> <u>id.</u> The longstanding general rule, however, is that isolated incidents of hostile or abusive language are typically insufficient to support a hostile work environment claim. <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

The conduct alleged by Martin falls far short of meeting this element. Two instances of harassing conduct, neither of which were threatening or particularly abusive and neither of which interfered with Martin's work performance, are simply

insufficient to support a hostile work environment claim. See Jordan v. Alternative Resources Corp., 458 F.3d 332, 340-42 (4th Cir. 2006); see also Faragher, 524 U.S. at 788 ("Properly applied, [workplace discrimination laws] will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.") (internal quotations omitted). Even if Martin were to attempt to bolster his claim by alleging a more generalized hostility to older individuals, and a corresponding favoring of younger employees, by Cameron, Martin's claim would still fail. See Causey v. Balog, 162 F.3d 795, 801-02 (4th Cir. 1998) (general statements of hostility, without specific evidentiary support, are not sufficient to support a hostile work environment claim). Therefore, Martin has failed to meet his burden to prove the severity and pervasiveness of the harassing conduct, and his hostile work environment claim fails for the reasons above.

Martin's claim also fails on the fourth element of the hostile work environment claim because there is no basis on which to hold S&S liable for the allegedly harassing conduct. See Baqir, 434 F.3d at 745-46. To hold an employer liable, the plaintiff must demonstrate that the employer "knew or should have known about the harassment and failed to take effective action to stop it." Sunbelt Rentals, 521 F.3d at 319. The Fourth Circuit

has stated directly that "[n]o employer can lightly be held liable for single or scattered incidents" and that "[c]ompanies cannot, of course, be charged with cleansing their workplace of all offensive remarks." Id. at 318. These are precisely the sorts of activities for which Martin seeks to hold S&S accountable. The charged instances of harassment were singular events that Martin disconnected in time or by perpetrator. (See Def. Mem. at Exs. 3, 8, 26; Def. Rep. at Ex. A.) S&S could not reasonably have been expected to have known about or stopped the harassing comments before they were made when they had no notice that such comments might be made. Therefore, Martin's claim fails on the fourth element as well, and judgment will be granted for S&S on Martin's hostile work environment claim.

IV. Retaliation

An employer violates the ADEA by retaliating against an employee for engaging in a protected activity. 29 U.S.C. § 623(d). To succeed on a retaliation claim, the plaintiff must prove that: (1) he engaged in protected conduct; (2) he was subjected to an adverse employment action that occurred after that conduct; (3) the protected conduct was a motivating factor in the employer's decision to take the adverse employment action. See O'Malley, Grenig, & Lee, 3C Federal Jury Practice and Instructions, § 171.25 (5th ed. 2000). At the summary judgment stage, retaliation claims are provable by the same two modes as

substantive discrimination claims: the McDonnell Douglas burden shifting framework or direct evidence of retaliatory discrimination. See King, 328 F.3d at 150-51 (applying McDonnell Douglas framework); Laber, 438 F.3d at 430.

It appears from his pleadings that Martin is proceeding with his retaliation claim under the McDonnell Douglas framework, though his language is somewhat muddled. (Def. Opp. at 32; Def. Mem. at 25-26.) In any event, Martin has produced no direct evidence of retaliation, so analysis under the McDonnell Douglas framework is appropriate. See James v. City of Chesapeake, 424 F.Supp.2d 852, 856-57 (E.D.Va. 2005).

The McDonnell Douglas burden shifting framework operates in essentially the same manner in the retaliation context as it does in the arena of substantive discrimination. See King, 328 F.3d at 151. The elements of the prima facie case of retaliation are that:

> (1) [he] engaged in protected activity; (2) the employer took adverse employment action against [him]; and (3) a causal connection existed between the protected activity and the asserted adverse action.

Id. If the plaintiff establishes a prima facie case, the rest of the McDonnell Douglas framework operates in the same manner as in the substantive discrimination context. See id.; see also Section II.B, supra. S&S does not dispute that adverse employment actions were taken against Martin. (See Def. Mem. at 28; Def.

33

Opp. at 26-27.[12])    Therefore, the Court must now determine
whether Martin engaged in any protected activity and whether a
causal connection existed between that activity and the adverse
employment actions.

Martin argues that his various emails and memoranda
repeating Cameron's comment about trading being a young person's
game were protected activity because Cameron's comment created a
hostile work environment. (Pl. Mem. at ¶ 3.)   The ADEA protects
employees who oppose unlawful, discriminatory employement
practices that the affected employee reasonably believes to be
unlawful. See 29 U.S.C. § 623(d); Jordan, 458 F.3d at 338.   As
the Fourth Circuit recently noted:

> Although the retaliation claimant does not have
> to show that the underlying discrimination claim
> was meritorious to prevail on a related
> retaliation claim, he must show that he
> subjectively (that is, in good faith) believed
> that his employer violated the ADEA, and that his
> belief was objectively reasonable in light of the
> facts.

Johnson v. Mechanics & Farmers Bank, 309 Fed.Appx. 675, 685 (4th
Cir. 2009) (unreported) (internal quotations omitted).   It is
undisputed that Martin had the requisite subjective belief that
the statement he reported was unlawful; S&S argues, however, that

---

[12] S&S does dispute that the imposition of a $500,000 production
expectation was an adverse employment action. (See Def. Mem. at
35-36.)   Analysis of this issue will not affect the outcome of
this motion, so that issue need not be considered.

Martin's belief as to that illegality was not objectively reasonable.

Martin's belief that Cameron had violated the ADEA was not objectively reasonable.  The Fourth Circuit's opinion in Jordan, which came to the same conclusion, is directly on point. See 458 F.3d at 338-41.  In Jordan, the plaintiff reported to management a blatantly and vilely racist comment made by a coworker and the plaintiff's employment was terminated soon thereafter. See id. at 336.  The plaintiff then brought a Title VII retaliation suit against his employer. See id.  The Fourth Circuit, in analyzing the defendant's motion to dismiss, held that the plaintiff could not have had a reasonable belief that a single, isolated comment gave rise to a hostile work environment claim in the face of longstanding precedent to the contrary. See id. at 340-41.  Also, the plaintiff in Jordan had no factual basis for a belief that the creation of a hostile work environment was imminent, because no facts in the record indicated that the comment was likely to incite a pervasively racist environment. See id. at 341.

The parallels between the two cases are abundantly clear: Martin, like the plaintiff in Jordan, was complaining about a single, isolated comment. (See Def. Mem. at Exs. 3, 8, 26; Def. Rep. at Ex. A.).  Furthermore, no evidence in the record suggests that Cameron's comment was likely to incite an environment that would be hostile to older workers.  Therefore, Martin's

complaints throughout January, 2006 did not constitute protected activity, and Martin's retaliation claim fails on that basis.

Martin's retaliation claim also partially fails on the third element of the prima facie case - causation. See King, 328 F.3d at 151.    To establish a retaliation claim, the plaintiff must establish that the adverse employment actions were taken because of the plaintiff's protected activity. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998).   An inference of a causal connection between protected activity and an adverse employment action can be created by temporal proximity, if that proximity is very close. See King, 328 F.3d at 151.    The adverse employment actions alleged by Martin are: (1) the withholding of the Goldman Sachs commission; (2) being placed on probation; (3) the institution of the $500,000 minimum annual production expectation; (4) the temporary removal of Martin's access to technology; (5) the problems with Martin's later access to RealPoint; and, (6) the removal of Martin's access to S&S capital for risk transactions. (Pl. Mem. at ¶ 68.)

The first action, withholding the Goldman Sachs commission, predated Martin's alleged protected conduct, and therefore could not have been caused by that conduct. (See id. at ¶¶ 65, 69.) Furthermore, the problems with Martin's access to technology were caused solely by Cameron, who was never informed of Martin's

complaints of age discrimination. (See Def. Mem. at Exs. 5, 12; Def. Rep. at Ex. A.)  Cameron, therefore, could not have been retaliating against Martin for those complaints, because he was unaware of them. See Dowe, 145 F.3d at 657.

The remaining actions, however, were taken in close temporal proximity to the putatively protected conduct: Martin's first report occurred on December 24, 2005, and the last of these adverse actions occurred on March 14, 2006. This is nearly exactly the same length of time that the Fourth Circuit in King noted was close enough to create an inference of causality. See 328 F.3d at 151. It is worth noting, however, that this temporal proximity is the only fact that creates an inference of causality, and that the inference at this stretch of time is weak. See id. Furthermore, Luse, to whom Martin made his initial complaint, was involved in the decision to place Martin on probation, institute the production expectation, and remove Martin's access to capital. (See Def. Mem. at Ex. 12.) Therefore, Martin's claim of retaliation respecting these employment actions does not fail on the third element of the prima facie case, although it is a close question.[13]

As noted above, if a prima facie case has been made, the burden passes to the employer to articulate a legitimate,

---

[13] Martin's claims with respect to those actions do, of course, fail on other grounds, for the reasons set forth above.

37

nondiscriminatory reason for the adverse employment action. See King, 328 F.3d at 151. Martin has not established such a prima facie case, but, even if he had, S&S has proffered a legitimate, nondiscriminatory reason for its various actions: Martin's erratic and undisciplined behavior. See Section II.B, supra. Martin has set forth no evidence, even taking into account that evidence used in the attempt to establish his prima facie case, indicating that this reason is pretextual. See id. The statements of Martin's supervisors that the various actions taken against him were taken because of his disciplinary problems are unrebutted except by Martin's speculative accusations, which are insufficient to create a genuine issue of material fact. Therefore, Martin's retaliation claim fails.[14]

## CONCLUSION

For the foregoing reasons, the Martin's Motion for Summary Judgment (Docket No. 97) will be denied, Martin's Motion to Add Exhibits (Docket Number 141) will be denied as moot, and S&S's Motion for Summary Judgment (Docket Number 126) will be granted.

---

[14] The failure of all of Martin's claims renders it unnecessary for the Court to consider the after-acquired evidence defense asserted by S&S, because that defense only serves as a limitation on recovery for an otherwise-successful plaintiff. See Miller v. AT&T Corp., 250 F.3d 820, 837-38 (4th Cir. 2001).

The Clerk is directed to send a copy of this Memorandum Opinion to the plaintiff.

It is so ORDERED.

_____ /s/     REP

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:   June 17, 2009